**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PERFORMANCE PRICING HOLDINGS, LLC, | |
| Plaintiff, | Case No.  1:15-cv-09712 |
| V. | **JURY TRIAL DEMANDED** |
| GOOGLE, INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff Performance Pricing Holdings, LLC ("Performance Pricing") files this Complaint against Google Inc. ("Google") for infringement of U.S. Patent No. 7,089,195 (the "'195 Patent") and U.S. Patent No. 8,799,059 (the "'059 Patent") (collectively the "Asserted Patents" or the "Rosenberg Patents").

## THE PARTIES

1. Performance Pricing is a Delaware LLC with its principal place of business at 1303 Third Avenue, Suite 3R, New York, NY 10021.

2. Google is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## JURISDICTION AND VENUE

3. This is an action for patent infringement under Title 35 of the United States Code.

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (patents), because this is a civil action for patent infringement arising under the United States patent statutes, 35 U.S.C. § 101 *et seq*.

1

5.   This Court has personal jurisdiction over Google because Google has committed, and continues to commit, acts of infringement in the State of New York, including in this district, has conducted business in the State of New York, including in this district, and/or has engaged in continuous and systematic activities in the State of New York.  Google has an office located at 76 Ninth Avenue, 4th Floor, New York, NY 10011.  This New York office is the second biggest office after its Global headquarters and is one of the largest Google offices in the world.  This New York office is home to the largest number of engineering jobs outside of Mountain View and is one of Google's biggest sales offices in the world.   The New York office is the center of operations for Corporate Engineering, the team that builds and maintains the internal systems that keep the company running.

6.   Attached as Exhibit 1 to this Complaint, and incorporated herein by reference, is a copy of a document available on Google's website.

7.   Google helped provide $21.5 billion of economic activity for New York businesses, website publishers and non-profits in 2014.  Exhibit 1.

8.   171,000 New York businesses and non-profits benefitted from using Google's advertising tools, AdWords and AdSense, in 2014.  Exhibit 1.

9.   Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (c) and 1400(b) because Google is deemed to reside in this district and/or has committed acts of infringement in this district.

**THE ASSERTED PATENTS**

10. Attached as Exhibit 2 to this Complaint is a copy of the '195 Patent, incorporated herein by reference.

11. Attached as Exhibit 3 to this Complaint is a copy of the '059 Patent, incorporated herein by reference.

12. Ari Rosenberg is the named inventor on the Asserted Patents.

13. The inventions recited in the claims of the Asserted Patents are generally directed to novel and improved systems and/or methods for the presentation of advertisements on the Internet.

14. In particular, the Asserted Patents describe systems and methods for the presentation of advertisements on the Internet that include lowering the cost of advertising to an advertiser by the internet advertising seller (*e.g.*, Google) as viewer action increases (*e.g.*, users click on advertisements).

15. Internet users' clicks increase for advertisements that are more relevant.

16. Internet user action increases for advertisements that are more relevant.

17. Under the inventions recited in the Asserted Patents, the advertiser has an incentive to provide advertisements that are clicked on more often, *i.e.*, advertisements that are more relevant and compelling.  This is because the advertiser's cost will be lowered as the quantity of viewer action, *e.g.*, clicks, increases.

18. Under the inventions recited in the Asserted Patent, more relevant and compelling advertisements are presented to the user of the Internet.

19. Users of the Internet benefit from the inventions recited in the claims of the Asserted Patents with an improved Internet because advertisers are encouraged to provide to Internet website owners more relevant advertising in exchange for lower pricing (a benefit to the advertiser) and the viewer of the website is presented with more relevant and compelling advertisements.  This also benefits the Internet website owner, such as Google, because more

relevant ads lead to more click-throughs, which leads to increased revenue to the website owner because advertisers pay per click-through.  *See, e.g.*, the '195 Patent, Col. 10, line 48-Col. 11, Line 33; Exhibit 2 ("The result-a lower bid ad with more clicks generated more revenue than a higher bid ad with fewer clicks").

20. Mr. Rosenberg's inventions were later implemented by Google and have been referred to as "a breathtaking innovation" over the prior art.  *See* May 27, 2008 article titled "Google AdWords: A Brief History of Online Advertising Innovation" by Scott Karp, available on the website http://publishing2.com/2008/05/27/google-adwords-a-brief-history-of-online-advertising-innovation/, attached as Exhibit 4, incorporated herein by reference.

21. One example of the inventions recited in the claims of the Asserted Patents is recited in claim 6 of the '059 Patent:

> 6. A system for the presentation of at least one advertisement message to viewers of at least one website, the system comprising:
>
> at least one processor; and
>
> at least one storage device in communication with the at least one processor, the at least one storage device including instructions that, when executed by the at least one processor, enable the performance of a method comprising the steps of:
>
> ascertaining with the at least one processor a predetermined cost to an entity of an advertising campaign;
>
> presenting, with the at least one processor, at least one message associated with the advertising campaign for display on a website such that the advertising message is viewable via one or more viewer computers;
>
> detecting with the at least one processor a quantity of actions performed by users of the one or more viewer computers; and
>
> as the quantity of the detected actions increases, then with the at least one processor lowering the cost to the entity of the advertising campaign below the predetermined cost.

'059 Patent, Col. 12, Line 53-Col. 13, Line 7.

## GOOGLE'S INFRINGING ACTIVITY

22. Examples of Google's infringing activity are Google's AdWords and AdSense.

23.   In operation, Google's AdWords tracks the click-throughs of an advertising message.

24. In operation, Google's AdWords uses the amount of click-throughs as one factor in determining that advertisement's AdRank.

25. Attached as Exhibit 5 is a copy of a Google website.  *See*,

https://support.google.com/adwords/answer/2454010?vid=0-635769996327512563-1490736046.

26.  Exhibit 5 states: "By improving the following factors you can help improve the quality components of your Ad Rank:  Your ad's expected CTR: This is based in part on your ad's historical clicks and impressions (excluding factors such as ad position, extensions, and other formats that may have affected the visibility of an ad that someone previously clicked)."

27. In operation, Google's AdWords rewards advertisements with better AdRank by lowering the cost the advertiser pays per click.

28. Exhibit 5 states: "The quality components of Ad Rank are used in several different ways and can affect the following things in your account:…Your actual cost-per-click (CPC): Higher quality ads can often lead to lower CPCs.  That means you pay less per click when your ads are higher quality."

29. Attached as Exhibit 6 are portions of Google's Form 10-K.

30. AdWords is Google's primary auction-based advertising program and helps create simple text-based ads that appear on Google websites and the websites of Google Network Members who use Google's advertising programs to deliver relevant ads alongside their search results and content.  Exhibit 6.

31. Google Network Members use the AdSense program to deliver relevant ads that generate revenues and enhance the user experience.  Exhibit 6.

32. An example of how Google's infringing AdWords system works is set forth below.

33. Google's AdWords program is stored on a server.

34. A server runs Google's AdWords program.

35. In operation of AdWords, an AdWords user can submit a maximum cost-per-click bid for advertising.

36. In operation of AdWords, an AdWords user can also submit a daily budget.

37. In operation of AdWords, an AdWords user's ad can be displayed on the Google website.

38. In operation of AdWords, when the AdWords user's ad is displayed on the Google website, it can be viewed by one or more people having access to that website.

39. In operation of AdWords, Google keeps track of how many times someone clicks on an AdWords user's ad.

40. In operation of AdWords, Google stores the amount of times someone clicks on an AdWords user's ad.

41. In operation of AdWords, Google charges the AdWords user based on the amount of times someone clicks on an AdWords user's ad.

42. In operation of AdWords, an AdWords user is, at least on some occasions, charged a lower cost-per-click than the maximum cost-per-click bid it submitted.

43. In operation of AdWords, as clicks on an AdWords user's ad increases, Google lowers the cost-per-click it charges from the maximum cost-per-click bid that the user submitted.

6

44. In operation of AdWords, an AdWords user is, at least on some occasions, charged less than the maximum cost-per-click bid it submitted because, as clicks on an AdWords user's ad increases, Google lowers the cost-per-click it charges from the maximum cost-per-click bid that the user submitted.

45. In operation of AdWords, an AdWords user can also submit a maximum cost-per-thousand impressions (CPM) bid for advertising.

46. In operation of AdWords, an AdWords user is, at least on some occasions, charged a lower CPM than the maximum CPM bid it submitted

47. In operation of AdWords, if an AdWords user submits a cost-per-thousand impressions (CPM) bid, as clicks on an AdWords user's ad increases, Google lowers the CPM it charges from the maximum CPM bid that the user submitted.

## GOOGLE'S SUCCESS FROM THE INFRINGING ACTIVITY

48. Google helped provide $131 billion of economic activity for nationwide businesses, website publishers and non-profits in 2014.

49. 1.8 million nationwide businesses and non-profits benefitted from using Google's advertising tools, AdWords and AdSense, in 2014.

50. Google generated approximately $59,056,000,000.00 in advertising revenues from Google websites and Google Network Members' websites in 2014.  Exhibit 6.

## GOOGLE'S PURSUIT OF INTERNET ADVERTISING PATENTS

51. Google is the assignee named on U.S. Patent No. 8,700,470, attached as Exhibit 7.

52.  U.S. Patent No. 8,700,470 states "This invention pertains in general to electronic commerce and in particular to advertising and selling items on the Internet."  U.S. Patent No. 8,700,470, Exhibit 7, Col. 1, Lines 14-16.

53. During prosecution of U.S. Patent No. 8,700,470, Google took the position, in front of the United States Patent and Trademark Office, that the claims of U.S. Patent No. 8,700,470 were directed to patent-eligible subject matter under 35 U.S.C. § 101.

54. The claims of U.S. Patent No. 8,700,470 are directed to an improved system and/or method of internet advertising.

55. Google believes that an improved system and/or method of internet advertising is not an abstract idea.

56. Google believes that the claims of U.S. Patent No. 8,700,470 are not directed to an abstract idea.

57. Google believes that the claims of U.S. Patent No. 8,700,470 recite patent-eligible subject matter under 35 U.S.C. § 101.

58. Google believes that improved systems and/or methods of internet advertising are patentable subject matter under 35 U.S.C. § 101.

## NO PRIOR ART ANTICIPATES ANY CLAIMS OF THE ASSERTED PATENTS

59. Advertising has been around since the eighteenth century when print ads in newspapers were used to persuade readers to purchase goods or services.  Prior to April 30, 2001, traditional advertising used a method for the presentation of advertisements called push marketing, a one-way communication from the advertiser to the audience.  The advertiser would simply attach its brand and/or product message to various forms of mass communication that it believed the target audience had an interest in, such as newspapers, magazines, billboards, radio, and TV.  The advertiser crafted its ad message based on what it wanted the consumer to see, hear or read.  12/10/15 Zatkovitch Decl., ¶ 36, attached as Exhibit 8 and incorporated herein by reference.

60. Traditional advertising used a method for the presentation of advertisements that included charging advertisers, in part, based on CPM, or cost to be exposed to 1,000 customers of that media product.  For example, print media ad costs (*e.g.*, newspapers, magazines) were typically determined based on the circulation of the publication, the physical dimensions (size of the ad) and color and location characteristics of the ad, and the cost per thousand people (CPM) receiving the publication: Print Ad Cost = Circulation in Thousands x Size/Characteristics of Ad x CPM.  12/10/15 Zatkovitch Decl., ¶ 37.

61. Similarly, the method for the presentation of advertisements for radio advertisers included charging the advertiser based on the number of listeners, the time slot and duration, other characteristics of the radio ad,  and the cost to be exposed to one thousand listeners: Radio Ad Cost = Listeners in Thousands x Ad Characteristics x CPM. 12/10/15 Zatkovitch Decl., ¶ 38.

62. Television advertising also utilized this method for the presentation of advertisements that included charging the advertiser based on the number of viewers reached by a given program, the time slot, duration of the commercial, and other audience characteristics, and the cost per thousand people (CPM) exposed to the commercial: Television Ad Cost = Viewers in Thousands x Duration X Audience Characteristics x CPM.  12/10/15 Zatkovitch Decl., ¶ 39.

63. With respect to television, since there is a finite number of available advertising spots for commercials, the pricing of television advertising also had a bidding component built into it "Televisions advertising inventory is sold to the highest bidder.  You could sign a contract with a television station for a certain number of spots to be aired during a specific show at certain price, and have none of your commercials air.  Contracts generally allow the stations to pre-empt your commercials if they get higher price offers."  12/10/15 Zatkovitch Decl., ¶ 40.

64. The traditional methods for the presentation of advertisements also included discounts to advertising charges.  Discounts typically fell into two main categories—frequency and volume.  Buyers could earn frequency discounts based on how often they ran their advertisement.   Sellers also utilized volume discounts to encourage buyers to make larger advertising buys.  Buyers could earn volume discounts based on the total volume they agreed to purchase (e.g., total money spent on television commercials, total newspapers column-inches purchased).  12/10/15 Zatkovitch Decl., ¶ 41.

65. In sum, in traditional methods for the presentation of advertisements, the advertisers chose where they wanted the ads to appear – which network and program, which radio station and time slots, which newspaper and editions, or which billboard location.  The Seller of the advertising inventory (i.e. advertising space) sold its inventory at a fixed price.  The buyer's price did not change based on how relevant, compelling, or effective the ad was (e.g., how good the content of the ad was, how many people responded to the ad to purchase products, etc.).  12/10/15 Zatkovitch Decl., ¶ 42.

66. Internet advertising can occur as straight display ads on a web page (such as often referred to as "banner ads")  or through the use of Keyword ads on a Search Engine where text ads are displayed along-side and above the search results.  12/10/15 Zatkovitch Decl., ¶ 43.

67. The arrival of the Internet created a new medium for advertising and the early methods for the presentation of advertisements on the Internet did not change from the traditional methods for the presentation of advertisements discussed above.  For example, the early methods for the presentation of advertisements on the Internet included charging a fixed price for a fixed duration of exposure.  As one specific example, the first clickable ad on Hotwired bought by

AT&T for its "You Will" campaign was purchased for a duration of three months at the price of $30,000.  12/10/15 Zatkovitch Decl., ¶ 44.

68. Before the effective filing date of the Rosenberg Patents, sellers/publishers of advertising space on the Internet ("Sellers") used a method for the presentation of advertisements that included charging purchasers of advertising space ("Buyers") according to three different methods: 1) a fixed-fee pricing model (in which  a fee was charged for the presentation of the ad message regardless of whether any viewer actions took place in response to being exposed to the ad); 2) a performance-based pricing model where advertisers were not directly charged for the amount of ad impressions, but rather, were charged an agreed upon fee (i.e. fixed fee) each time a viewer performed a measurable action (e.g., a click on the ad) in response to being exposed to the ad (e.g. cost per click), or a 3) hybrid of these two models.  '195 Patent, Col. 3, Line 50-Col. 4, Line 42.  12/10/15 Zatkovitch Decl., ¶ 45.

69. Under the first model, the fixed-fee pricing model, a Buyer was typically charged based on the Cost Per Thousand (known as "CPM") of advertising messages presented to a viewer (known as "impressions").  '195 Patent, Col. 3, Lines 54-57. As mentioned previously, the first monetization of Internet ads began in the mid-90s using a model where the ads were sold for a fixed fee for a certain duration.  Later, these ads were also sold on a CPM basis ($10 per every thousand impressions for example).  12/10/15 Zatkovitch Decl., ¶ 46.

70. Prodigy is credited with creating the first method for the presentation of online display ads in 1984.  Prodigy offered online news, sports, email and bulletin boards (https://en.wikipedia.org/wiki/Web_banner).  Prodigy's presentation of online ads consisted of placing the ad at the bottom of each screen for viewing by the Prodigy customer.  These ad's, however, were not clickable.   In 1993, Global Network Navigator was the first commercial

website to sell a clickable advertisement.  The ad was sold to the Silicon Valley law firm Heller Ehrman White & McAuliffe.  This was quickly followed in 1994, by Hotwired, the first commercial web magazine, which sold larger quantities of online ad space/inventory and coined the term "banner advertising."  12/10/15 Zatkovitch Decl., ¶ 47.

71. As the number of webpages online and web servers connected to the Internet grew, Internet search engines emerged to help people find information on the World Wide Web. For example, Search engines automatically collect information from Web sites, create an index of the words they find within those pages, and then allow users to search the Internet by entering search terms or "keywords."  When a search-engine user enters a keyword to perform a search, the search engine will return a Search Engine Results Page (SERP).  The arrival of search engines created yet another avenue for online advertising – "Keyword advertising".  In Keyword advertising the advertiser Buyer pays to have its ads presented on the web page containing the search results, the SERP, when someone searches for a particular keyword or phrase.  12/10/15 Zatkovitch Decl., ¶ 48.

72. Initially, and similar to traditional methods for the presentation of advertisements, the method for the presentation of ads with Search Engines included charging a fixed fee in return for an amount of ad impressions on search results pages tied to a particular keyword.  The keywords were chosen by the Buyer (e.g., a florist would choose the keyword "flowers").  The prices charged for the ads were fixed according to the position on the page an ad would occupy. Like traditional advertising, Advertisers were charged this fixed fee for every 1,000 impressions (CPM).  12/10/15 Zatkovitch Decl., ¶ 49.

73. In 1998, GoTo.com (GoTo.com was later renamed Overture Services Inc. and was then acquired by Yahoo!) introduced a method for the presentation of advertisements that

included charging an advertiser only when a viewer clicked its ad (Cost Per Click (CPC)), as opposed to how often the ad was displayed[1]. Under this method for the presentation of advertising, the Buyer was charged an agreed upon fee (i.e. fixed fee) based on each time a viewer action occurred in response to the ad displayed. This was called Cost Per Action ("CPA") (e.g., a viewer performs an action in response to an advertising message). '195 Patent, Col. 3, Lines 61-65. One example of CPA viewer action under this model is Cost Per Click ("CPC") where the method for the presentation of advertisements includes charging a Buyer an agreed upon fixed fee every time a viewer clicks on a hypertext link associated with the advertising message. '195 Patent, Col.3, Line 66- Col. 4, Line 8. 12/10/15 Zatkovitch Decl., ¶ 50.

74. GoTo.com's method for the presentation of advertisements also included an auction process. This process auctioned off ad space on their search engine so that the highest bidder received the top ad placement positions on its SERPs. It was a 'pay for position' model in which advertisements appeared on GoTo.com based on how much the advertiser was willing to pay for a single click. "Gross's basic model was Yellow Pages ads, in which businesses paid a premium to place their ads in the relevant category. The biggest impact was made by a full-page ad, and the equivalent of that in a search engine was a high place in search results. Gross's innovation was to have advertisers compete for those places: to get your ad in the search results under a given keyword, you had to outbid other advertisers in an auction." 12/10/15 Zatkovitch Decl., ¶ 51.

75. Some Sellers of advertising also employed a hybrid pricing model, in which a Buyer pays a lower Cost Per Thousand impression rate (i.e. fixed fee) plus a fixed fee based on a Cost Per Action by the viewer. 12/10/15 Zatkovitch Decl., ¶ 52.

---

[1] https://en.wikipedia.org/wiki/Yahoo!_Search_Marketing, attached as Exhibit 9.

76. Although the pricing instructions used with the presentation of online advertising evolved over time, the basic tenants of online advertising remained the same as traditional advertising. The advertiser still created their online ads based on what they wanted the consumer to see. The advertisers still choose where the ad would appear based on the keywords they bid on and the amount they bid. The Seller of the online advertising inventory still sold its inventory for the highest price it could get per click or per view (*i.e.*, impression) for that position on the page. One difference between Internet advertising and traditional advertising was that each presentation of every single advertising impression on the Internet could be measured in real time. 12/10/15 Zatkovitch Decl., ¶ 53.

77. One example of art filed before the effective filing date of the Rosenberg Patents is described in U.S. Patent No. 6,269,361 to Davis, et al. ("Davis"). Davis was identified as prior art by the examiner during prosecution of the '059 Patent and the '059 Patent was allowed over this reference. Davis discusses the use of advertising on Internet search engine websites (a present day example is Google or Yahoo). On April 23, 2002, Overture filed suit against Google alleging infringement of Davis. On August 9, 2004, Overture and Google filed a stipulation of dismissal in light of an agreement settling the lawsuit. Evidencing the importance of methods for the presentation of advertising on the Internet, at the time, it was approximated that the settlement was worth $291 million to $365 million dollars. 12/10/15 Zatkovitch Decl., ¶ 54.

78. Davis discloses "a continuous online competitive bidding process" where advertisers (Buyers) bid on internet search terms such that the advertiser with the highest bid for a search term will appear first in the search results after a computer user enters in a search for that term. *See* Davis, Abstract. 12/10/15 Zatkovitch Decl., ¶ 55.

79. In Davis, the advertiser or Buyer "is charged in direct proportion to the number of actual visits generated by the search engine" or, in other words, according to the performance-based pricing model where the Buyer is charged based on the Cost Per Action ("CPA").  *See* Davis, Col. 4, Lines 32-33.  12/10/15 Zatkovitch Decl., ¶ 56.

80. Specifically, according to Davis "[e]ach bid is specific to a search term/web site combination and corresponds to a money amount that the advertiser will pay to the owner of the search engine each time a searcher clicks on the advertiser's hyperlinked listing in the search result list generated by the search engine," *i.e.*, "a "price-per-click" paid by the advertiser for each referral to the advertiser's site through the search result list."  Davis, Col. 5, Lines 22-27; Col. 10, Lines 4-6.  12/10/15 Zatkovitch Decl., ¶ 57.

81. In Davis, "The higher the bid, the more advantageous the placement in the search result list that is generated when the bidded search term is entered by a searcher using the search engine.  The search result list is arranged in order of decreasing bid amount, with the search listing corresponding to the highest bids displayed first to the searcher."  Davis, Col. 5, Lines 35-40.  12/10/15 Zatkovitch Decl., ¶ 58.

82. Another example of art with a filing date before the effective filing date of the Rosenberg Patents is described in U.S. Patent Application 2001/0056369 to Takayama et al. ("Takayama").  Takayama was listed as prior art during prosecution of both Rosenberg Patents and both Rosenberg Patents were allowed over Takayama.  Takayama discusses setting "the cost of an advertisement high when the effect of the advertisement is large, and set the cost low when the effect of the advertisement is small."  Takayama, at ¶ 11.  Takayama sets "advertisement cost higher in a certain location and region or a certain time slot and season which is popular among

users or occupies the interest of users, or in which a large number of requests for advertisement posting are made by advertisers."  Takayama, at ¶ 1212/10/15 Zatkovitch Decl., ¶ 59.

83. The following are examples of how the inventions recited in the claims of the Rosenberg Patents are different from other methods for the presentation of advertisements. 12/10/15 Zatkovitch Decl., ¶ 62.

84. Davis does not teach concepts such as the Seller inserting a set of pricing instructions into its method for the presentation of advertisements, that automatically lowers the agreed upon fee of advertising based on the performance of the ad, or providing bonus impressions to the Buyer based on the performance of the ad so that better performing ads, *i.e.*, more relevant and appealing ads, get shown more and cost less.  Davis still allowed Buyers to gain exposure (impressions), at a low cost using irrelevant ads, by bidding high on a cost per click, but then not having to actually pay much because users would not click on the irrelevant ads.  12/10/15 Zatkovitch Decl., ¶ 63.

85. As with Davis, Takayama does not teach concepts such as the Seller inserting a set of pricing instructions into its method for the presentation of advertisements, that automatically lowers the agreed upon fee of advertising based on the performance of the ad, or providing bonus impressions to the Buyer based on the performance of the ad so that better performing ads, *i.e.*, more relevant and appealing ads, get shown more and cost less.  12/10/15 Zatkovitch Decl., ¶ 64.

86. Prior to the effective filing date of the Rosenberg Patents, April 30, 2001, no prior art anticipated any claims of the Rosenberg Patents.   12/10/15 Zatkovitch Decl., ¶ 65.

87. Prior to the effective filing date of the Rosenberg Patents, April 30, 2001, no prior art reference disclosed, either expressly or inherently, all of the limitations of the claims of the

Rosenberg Patents and no prior art system was known, in public use or on sale in the United States that contained all of the limitations of the claims of the Rosenberg Patents.  12/10/15 Zatkovitch Decl., ¶ 66.

88. One example of a prior art reference filed before the effective filing date of the Rosenberg Patents is U.S. Patent No. 6,269,361 to Davis ("Davis), discussed above.  12/10/15 Zatkovitch Decl., ¶ 67.

89. Davis does not contain all of the limitations of the claims of the Rosenberg Patents.  12/10/15 Zatkovitch Decl., ¶ 68.

90. Specifically, regarding independent claims 1 of the '195 Patent, Davis does not contain at least the following elements: "said sale price covering a predetermined number of impressions of an advertising message on a website and potential, to be earned bonus impressions of the advertising message on the website"; "the seller providing the predetermined number of impressions of the advertising message on the website from a server to the one or more viewers viewing the website on one or more viewer computers over a computer network"; "automatically determining a number of earned bonus impressions of the advertising message based on said one or more actions"; and "the seller automatically providing the determined number of earned bonus impressions of said advertising message on the website to said one or more viewer computers without charging beyond said sale price."  12/10/15 Zatkovitch Decl., ¶ 69.

91. Specifically, regarding independent claims 6 of the '195 Patent, Davis does not contain at least the following elements: "the seller and the buyer agreeing to a sale price for said advertising, said sale price covering a predetermined number of impressions of an advertising message on a website and potential, to be earned bonus impressions of the advertising message

17

on the website"; "the seller providing the predetermined number of impressions of the advertising message on the website from a server to the one or more viewers viewing the website on one or more viewer computers over a computer network"; "automatically determining a number of earned bonus impressions of the advertising message based on said one or more actions"; and "the seller automatically providing the determined number of earned bonus impressions of said advertising message on the website to said one or more viewer computers without charging beyond said sale price."  12/10/15 Zatkovitch Decl., ¶ 70.

92. Specifically, regarding independent claims 11 of the '195 Patent, Davis does not contain at least the following elements: "a computer system to provide the predetermined number of impressions of the advertising message on the website to one or more viewers viewing the website on one or more viewer computers over a computer network,"  "said computer system to determine a number of earned bonus impressions of the advertising message, based on said one or more actions, and said computer system to provide the determined number of earned bonus impressions of said advertising message on the website to said one or more viewer computers without charging beyond said sale price."  12/10/15 Zatkovitch Decl., ¶ 71.

93. As the dependent claims of the '195 Patent contain the limitations of the independent claims above, for at least the same reasons identified above, Davis does not contain all of the limitations of the dependent claims of the '195 Patent.  12/10/15 Zatkovitch Decl., ¶ 72.

94. Specifically, regarding independent claims 1 of the '059 Patent, Davis does not contain at least the following elements: "ascertaining with the at least one processor a predetermined cost to an entity per impression of an advertising message"; and "as the quantity of the detected actions increases, then with the at least one processor decreasing the cost per

impression of the advertising message to the entity below the predetermined cost."  12/10/15 Zatkovitch Decl., ¶ 73.

95. Specifically, regarding independent claims 6 of the '059 Patent, Davis does not contain at least the following elements: "as the quantity of the detected actions increases, then with the at least one processor lowering the cost to the entity of the advertising campaign below the predetermined cost."  12/10/15 Zatkovitch Decl., ¶ 74.

96. As the dependent claims of the '059 Patent contain the limitations of the independent claims above, for at least the same reasons identified above, Davis does not contain all of the limitations of the dependent claims of the '059 Patent.  12/10/15 Zatkovitch Decl., ¶ 75.

**THE CLAIMS OF THE ASSERTED PATENTS ARE NOT OBVIOUS**

97. The differences between the subject matter recited in the claims of the Rosenberg Patents and the prior art are not such that the subject matter as a whole would have been obvious before April 30, 2001 to a person having ordinary skill in the art in the subject matter of the Rosenberg Patents.  12/10/15 Zatkovitch Decl., ¶ 76.

98. Secondary considerations of non-obviousness also show that the subject matter recited in the claims of the Rosenberg Patents are not such that the subject matter as a whole would have been obvious before April 30, 2001 to a person having ordinary skill in the art in the subject matter of the Rosenberg Patents.  12/10/15 Zatkovitch Decl., ¶ 77.

99. Long felt but unsolved need and failure of others support non-obviousness of the claims of the Rosenberg Patents.  12/10/15 Zatkovitch Decl., ¶ 78.

100.      For example, there was a demand for improved and more relevant advertising content, but other tried and failed to satisfy that demand with a feasible solution as noted in Davis.  See, *e.g.*, Davis, Col. 3, Lines 42-25 ("Thus, the traditional paradigms of

advertising and search engine algorithms fail to effectively deliver relevant information via the World Wide Web to interested parties in a cost-effective manner."). 12/10/15 Zatkovitch Decl., ¶ 79.

106. Commercial success of products covered by claims of the Rosenberg Patents supports non-obviousness of the claims of the Rosenberg Patents. 12/10/15 Zatkovitch Decl., ¶ 80.

102. For example, Performance Pricing Holdings, LLC believes that Google's Adwords infringes at least one claim of each of the Rosenberg Patents. 12/10/15 Zatkovitch Decl., ¶ 81.

103. Google's Adwords is highly commercially successful. In 2004, 99% of Google's revenue, $3,143,288,000, was from advertising. *See* Google Annual Report 2004, pp. 23, 25, attached as Exhibit 10. Advertising revenues for Google were approximately $45,085,000,000 in 2014. See p. 24 of Google Form 10-K for period ending December 31, 2014, attached as Exhibit 6; 12/10/15 Zatkovitch Decl., ¶ 82.

104. As another example of commercial success of the inventions recited in the claims of the Rosenberg Patents, several companies have entered into licenses for U.S. Patent No. 7,089,195 and continuations of that patent such as 8,799,059. 12/10/15 Zatkovitch Decl., ¶ 83.

105. Industry praise of products covered by the claims of the Rosenberg Patents supports non-obviousness of the claims of the Rosenberg Patents. 12/10/15 Zatkovitch Decl., ¶ 84.

106. As an example of industry praise of products covered by the claims of the Rosenberg Patents, the website http://publishing2.com/2008/05/27/google-adwords-a-brief-

history-of-online-advertising-innovation/, attached as Exhibit 4, praised Google's AdWords

stating "The new version of AdWords adopted Overture's pay-per-click auction model, where

advertisers bid on how much they will pay per click.  If Google had copied Overture entirely, the

history of the web might be very different…but they didn't.  Instead Google introduced a

breathtaking innovation." 12/10/15 Zatkovitch Decl., ¶ 85.

107.     As an example of industry praise of products covered by the claims of the

Rosenberg Patents, the book "The Search How Google and Its Rivals Rewrote the Rules of

Business and Transformed Our Culture" by John Battelle, relevant portions attached as Exhibit

11,  praised Google's AdWords, stating "In February 2002, the company launched a new version

of AdWords that included auction and pay-per-click features, but with this service---unlike

Overture's---advertisers couldn't just buy their way to the top listing.  Instead, Google

incorporated the notion of an ad's popularity—its clickthrough rate---into its overall ranking.

This shift was simple, brilliant, and extremely effective…Google's decision to factor

clickthrough into an advertiser's ranking forced an economy of relevance and profit into the pay-

per-click model."  12/10/15 Zatkovitch Decl., ¶ 86.

108.     As an example of industry praise of products covered by the claims of the

Rosenberg Patents, the book "In the Plex How Google Thinks, Works, and Shapes Our Lives" by

Steven Levy, relevant portions attached as Exhibit 12, praised Google's Adwords stating "That

was not all.  The ad model that Veach and Kamanger created had yet another major innovation,

but this one was exclusively Google's.  It would become the least understood, most

controversial, and ultimately most powerful component of AdWords Select: a built-in function to

regulate ad quality.  The new system instituted financial incentives for *better* ads.  It lowered the

price for effective ads and meted out monetary punishment and even an online ad version of the death penalty for bad ads."  12/10/15 Zatkovitch Decl., ¶ 87.

109.    As an example of industry praise of products covered by the claims of the Rosenberg Patents, the book "In the Plex How Google Thinks, Works, and Shapes Our Lives" by Steven Levy praised Google's Adwords, stating "This was Google's first stab at what became known as ad quality.  It would become a vital component of the company's strategy, which viewed the ad system as a virtuous triangle with three happy parties: Google, the advertiser, and especially the user.  Unwanted ads made unhappy customers, so Google made it a high priority to calibrate the system to drive out ads that were irrelevant or annoying."  12/10/15 Zatkovitch Decl., ¶ 88.

110.    As an example of industry praise of products covered by the claims of the Rosenberg Patents, the book "In the Plex How Google Thinks, Works, and Shapes Our Lives" by Steven Levy praised Google's Adwords, stating "The beauty of the ad quality formula, says Sheryl Sandberg, is that 'it made the advertiser do the work to be relevant.  You paid less if your ads were more relevant.'" 12/10/15 Zatkovitch Decl., ¶ 89.

111.    As an example of industry praise of products covered by the claims of the Rosenberg Patents, the book "In the Plex How Google Thinks, Works, and Shapes Our Lives" by Steven Levy praised Google's Adwords, stating "Google's original system asked advertisers to pay a fixed rate to expose their ads on a results page triggered by targeted keywords.  The new system asked advertisers to participate in an auction that determined how much they would pay every time someone clicked on the targeted ad.  What's more, by rewarding better ads the new system made users happier by increasing the odds that what appeared on the page was relevant to their queries.  The system enforced Google's insistence that advertising shouldn't be a

transaction between publisher and advertiser but a three-way relationship that also included the user."  12/10/15 Zatkovitch Decl., ¶ 90.

112.    As an example of industry praise of products covered by the claims of the Rosenberg Patents, Online Spin, attached as Exhibit 13, praised Google's advertising methods: "Google has made billions for a lot of reasons, but no reason is more important than the fact that Google created a marketplace that rewards good advertising.  Sure, good advertising should always be rewarded by selling more product, but when Google's magic system started rewarding marketers by reducing the price per click for 'good' ads, it created a virtuous circle: better ads, happier users, efficient pricing for marketers…oh, and of course more money for Goooooooooooogle."12/10/15 Zatkovitch Decl., ¶ 91.

113.    As an example of industry praise of products covered by the claims of the Rosenberg Patents, Bloomberg Businessweek, in an article titled "The Secret To Google's Success" available at http://www.bloomberg.com/bw/stories/2006-03-05/the-secret-to-googles-success, attached as Exhibit 14, praised Google's AdWords stating "Now, research is showing that Google's auction methodology, invented internally and so important for its success, is far more innovative than auction experts once believed.  While superficially similar to earlier types of auctions, it is a 'novel mechanism' that 'emerged in the wild.'…AdWords Select, as it was called at its February, 2002, debut, was actually Google's third crack at an ad auction.  The first two were flawed, but Google founders Larry Page and Sergey Brin kept pushing.  Even the current system isn't perfect.  Advertisers complain that it's too much of a 'black box.'  Still, if the best measure of innovation is commercial success, Google's AdWords was a grand slam.  Says Kamanger: 'Third time's a charm.'" 12/10/15 Zatkovitch Decl., ¶ 92.

114.     As an example of industry praise of products covered by the claims of the Rosenberg Patents, The New York Times, in an article titled "Google Wants to Dominate Madison Avenue Too" available at

http://www.nytimes.com/2005/10/30/business/yourmoney/google-wants-to-dominate-madison-avenue , attached as Exhibit 15, praised Google's AdWords, stating "In early 2002, a Google employee, Salar Kamangar, now 28 convinced Mr. Schmidt and the founders to switch to an auction-based system like the one set up by Bill Gross, the head of IdeaLab.  Mr. Gross had created Goto.com, a search engine made up entirely of ads, where advertisers paid only if their ad was clicked on, and the advertiser who bid the most per click was listed first.  (Goto was later renamed Overture Services and then brought by Yahoo, an early Google backer that has become its fiercest rival.) Mr. Kamanger, though, had an important improvement on the model.  Rather than giving priority to the advertisers that bid the most per click, as Goto did, he realized that it was better to save the front of the line for ads that brought in the most money—a combination of the bid and the number of clicks on the ad.  This was not only more profitable, but it also linked readers to ads that were more relevant to them."12/10/15 Zatkovitch Decl., ¶ 93.

115.     As an example of industry praise of products covered by the claims of the Rosenberg Patents, a book titled "I'm Feeling Lucky The Confessions of Google Employee Number 59" by Douglas Edwards, relevant portions attached as Exhibit 16, praised Google's AdWords stating "Salar experienced an epiphany.  Google could assign a quality score to each ad.  'Quality' would be our prediction of how likely a user was to click on an ad.  If that score was factored with the amount the advertiser was willing to pay, we could rank ads by their potential for earning money for Google—their effective CPM.  Everyone would benefit.  The user would see more relevant ads.  The advertiser would get more clicks.  Google would make

more revenue.  It was a brilliant idea….That one idea was worth billions and billions of dollars."12/10/15 Zatkovitch Decl., ¶ 94.

116.     The patentability, novelty, and inventive concepts of the claims of the Rosenberg Patents is further supported by the Examiner's finding that the claims of the Rosenberg Patents are allowable.  See March 20, 2006 Notice of Allowance for U.S. Patent No. 7,089,195, Exhibit 17; June 11, 2014 Notice of Allowance for U.S. Patent No. 8,799,059, Exhibit 18.  12/10/15 Zatkovitch Decl., ¶ 95.

117.     In the Notice of Allowance for the '195 Patent the Examiner found "the features of selling a predetermined number of impressions of an advertising message at a website and automatically determining earned bonus impressions of the same message that are provided without charging beyond the original sale price based on the positive performance of the advertising message was not found in the prior art."  March 20, 2006 Notice of Allowance for U.S. Patent No. 7,089,195.  12/10/15 Zatkovitch Decl., ¶ 96.

118.     In the Notice of Allowance for the '059 Patent the Examiner found "Applicant's amendment that the predetermined cost of impressions is the one reduced, along with the other features, was seen to go past the prior art."  June 11, 2014 Notice of Allowance for U.S. Patent No. 8,799,059.  12/10/15 Zatkovitch Decl., ¶ 97.

## ADDITIONAL FACTS ABOUT THE ASSERTED PATENTS

119.     The claims of the Rosenberg Patents recite patent-eligible subject matter. 12/10/15 Zatkovitch Decl., ¶ 98.

120.     The inventions recited in the claims of the Rosenberg Patents are not directed to abstract ideas.   12/10/15 Zatkovitch Decl., ¶ 102.

121.     The claims of the Rosenberg Patents do not merely recite a mathematical algorithm (e.g. converting binary-coded decimal numerals into pure binary form).  12/10/15 Zatkovitch Decl., ¶ 103.

122.     The claims of the Rosenberg Patents do not merely recite methods of organizing human activity.  12/10/15 Zatkovitch Decl., ¶ 104.

123.     The claims of the Rosenberg Patents do not merely recite a fundamental economic practice (*e.g.*, hedging) or conventional business practice (*e.g.*, mitigating settlement risk using a third-party intermediary).  12/10/15 Zatkovitch Decl., ¶ 105.

124.     The claims of the Rosenberg Patents do not merely recite a commonplace business method aimed at processing business information, applying a known business process to a particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations.  12/10/15 Zatkovitch Decl., ¶ 106.

125.     The claims of the Rosenberg Patents do not merely recite a basic conceptual framework for organizing information.  12/10/15 Zatkovitch Decl., ¶ 107.

126.     The claims of the Rosenberg Patents do not recite a well-known concept that humans have always performed.  12/10/15 Zatkovitch Decl., ¶ 108.

127.     Therefore, the inventions recited in the claims of the Rosenberg Patents are not directed to abstract ideas and are patent-eligible.  12/10/15 Zatkovitch Decl., ¶ 109.

128.     The claimed system and methods of the Rosenberg Patents demonstrate a dramatic and unconventional change in the practice of the presentation of advertisements on the Internet, which is 'significantly more' than any abstract idea.  12/10/15 Zatkovitch Decl., ¶ 110.

129.     The claims of the Rosenberg Patents describe a specific solution to an identified problem particular to the realm of the Internet.  12/10/15 Zatkovitch Decl., ¶ 111.

130.     The claims do not broadly and generally claim the use of a computer to perform an abstract idea, but instead specify how to yield a desired result by describing a particular process to be used by a computer, and how certain aspects of that process are used to improve the function of the Internet itself (*e.g.*, presentation of more relevant and compelling advertisements).  12/10/15 Zatkovitch Decl., ¶ 112.

131.     The inventions recited in the claims of the Rosenberg Patents do not merely perform a well-known method using a generic computer.  12/10/15 Zatkovitch Decl., ¶ 113.

132.     The claims of the Rosenberg Patents do not merely recite routine or conventional use of the Internet.  12/10/15 Zatkovitch Decl., ¶ 114.

133.     The inventions recited in the claims of the Rosenberg Patents do not exist in the prior art.  12/10/15 Zatkovitch Decl., ¶ 115.

134.     Prior industry practices of the presentation of advertisements on the Internet included two predominant models that drove the presentation of advertisements 1) a fixed-fee pricing model in which buyers pay for the exposure of their ads regardless if a viewer responds and, 2) a performance-based pricing model where the buyer only pays when a viewer takes an action in response to viewing the advertisement.  In both cases, the fee to the Buyer is determined and unchanged once the campaign is served.  Under these earlier methods for the presentation of advertisements, the user of the Internet was often bombarded with irrelevant and/or unappealing ads.  12/10/15 Zatkovitch Decl., ¶ 116.

135.     Mr. Rosenberg's ideas of automatically instructing the ad server to award an advertiser or Buyer bonus impressions of an advertising message, decrease the effective predetermined cost for an advertising campaign, decrease the cost per impression of the advertising message, or lower the cost of an advertising campaign below a predetermined cost, based on the increase in the number of viewer actions (*e.g.*, clickthroughs), is a departure from the routine and conventional methods for the presentation of advertisements on the Internet (*e.g.*, charging a fixed fee per click through).  12/10/15 Zatkovitch Decl., ¶ 117.

136.     The Rosenberg Patents take a decidedly different approach to earlier methods for the presentation of advertisements.  For example, a Seller will use a system for the presentation of Internet advertisements with a novel set of instructions that automatically provide a lower advertising cost or bonus impressions for better performing ads.  Under this system, Buyers have the incentive to provide to the Seller better performing ads.  Because more relevant and compelling advertisements are better performing than less relevant and compelling advertisements, this results in the presentation of more relevant and compelling advertisements to viewers.  This is absolutely contrary to earlier methods for the presentation of advertisements. For example, in Davis, the system for the presentation of advertisements included pricing instructions where the fee agreed to be paid was unchanged.  In Davis, the system could be manipulated by Buyers so that irrelevant and/or unappealing advertisements (that did not elicit viewer responses, e.g. clicks) would still be presented more at no additional cost to the Buyer. Thus, in Davis, the Buyer has an incentive to provide irrelevant and/or unappealing ads because it still received advertising exposure at no additional cost.  In addition, in Davis, and contrary to the Rosenberg Patents, costs are actually increased for better performing ads (e.g., more

clickthroughs results in increased cost to the advertiser who pays per click through).  12/10/15 Zatkovitch Decl., ¶ 118.

138.    As noted in the articles about Google, the unconventional and contrary approach defined by the Rosenberg patents has resulted in a major paradigm shift in the industry.  12/10/15 Zatkovitch Decl., ¶ 119.

138.    Not only did Mr. Rosenberg's inventions benefit the viewers of the Internet, who were no longer bombarded with irrelevant and unappealing ads, the unconventional approach also turned out to actually benefit the Seller with increasing revenue to the Seller, even though lowering the price intuitively suggests the opposite.  This is because better performing ads get shown more often, will result in more actions by the viewers of those ads (generate more "clicks"), and, when the Seller charges per viewer action, an increase in viewer action results in an increase in Seller revenue.  12/10/15 Zatkovitch Decl., ¶ 120.

139.    Once it became understood by the industry that lowering the advertising cost of better performing ads and increasing the presentation of those advertisements actually increases revenue to the Seller, at least one commercial keyword auction Search Engine began using this approach.  12/10/15 Zatkovitch Decl., ¶ 121.

140.    The claims of the Rosenberg Patents do not merely recite functions performed by the computer/processor elements that are purely conventional.  For example, claim 6 of the '059 Patent recites that "as the quantity of the detected actions increases, then with the at least one processor lowering the cost to the entity of the advertising campaign below the predetermined cost."  12/10/15 Zatkovitch Decl., ¶ 122.

141.     The claims of the Rosenberg Patents do not merely recite well-understood, routine, conventional activities involving a computer previously known to the industry (*e.g.*, storing information).  12/10/15 Zatkovitch Decl., ¶ 123.

142.     The claims of the Rosenberg Patents recite solutions that are necessarily rooted in computer technology to overcome problems specifically arising in and unique to the Internet.  12/10/15 Zatkovitch Decl., ¶ 124.

143.     For example, the inventor of the Rosenberg Patents, Ari Rosenberg, recognized that early methods for the presentation of advertisements on the Internet, including that discussed in Davis mentioned above, were flawed by a set of pricing instructions that perversely rewarded Buyers an increase in the presentation of ad impressions, at no incremental cost, for delivering advertisements to a Seller that generated fewer viewer responses (i.e. presenting irrelevant and/or unappealing ads).  12/10/15 Zatkovitch Decl., ¶ 125.

144.     For example, just because an advertiser (Buyer) is willing to pay a significant amount per click (i.e., bidding a high cost per click) to appear more often or more prominently in the search results, it doesn't mean their ad would be 'clicked' more often.  It simply means their ad would be more visible. If the ad itself does not appeal to the viewer, or it is not relevant to what the viewer is searching for, the viewer will most likely click on a different ad or search result.  Therefore, an advertiser that does not display relevant or appealing ads will not be clicked as often.  As a result, a Buyer can obtain a desired exposure for its advertisements without paying a high price per click.  This leads to an incentive, under early online methods for the presentation of advertisements, for a Buyer to spend the minimum on providing relevant and appealing ads resulting in the end computer user often being bombarded with irrelevant and/or unappealing ads (often causing viewers to visit the Seller's website less often).  In addition, a

Seller will not receive as much revenue on an irrelevant ad regardless of how much the Buyer is willing to pay for the Cost per Click.  12/10/15 Zatkovitch Decl., ¶ 126.

       145.      These problems are unique to the Internet due to the virtual unlimited advertising inventory on the Internet and low cost to Buyers for the presentation of advertisements on the Internet.  See, e.g., '195 Patent, Col. 1, Lines 46-56 ("Sellers have attempted to cover costs and attract Buyers by offering hybrids of the fixed-fee and performance-based pricing models, but pressures brought on by increased accountability and a surplus of inventory, have made it increasingly difficult for Sellers to secure fair and balanced pricing."); Col. 2, Lines 42-45 ("The pressure on Sellers of Internet advertising to provide performance based pricing models is particularly intense because the Internet provides a high degree of accountability and potential inventory is almost limitless.").  As one example, according to Davis, "some web site promoters or promoters insert popular search terms into their web site meta tags which are not relevant because by doing so they may attract additional consumer attention at little to no marginal cost."  Davis, Col. 2, Lines 60-64.  The increased accountability on the Internet also makes the above problems unique to the Internet.  *See, e.g.*, '195 Patent, Col. 2, Lines 11-18 ("Another example is Internet-based advertising, where a set of instructions is attached to an advertising banner that redirects the Viewer to the merchant's web-page when that Viewer "clicks" on the banner. In this way, the merchant knows that the Viewer became interested in the product or service because of that message. Buyers use these methods of accountability to leverage Sellers into basing their fees on such performance.").  12/10/15 Zatkovitch Decl., ¶ 127.

       146.      Thus, the claims of the Rosenberg Patents address challenges unique to the Internet.  12/10/15 Zatkovitch Decl., ¶ 128.

147.     In sum, if adhering to the conventional functioning of the Internet and traditional methods for the presentation of advertisements, visitors to web sites were being bombarded with ad impressions that were less appealing and less relevant and often resulted in a poor experience for the user of the website.  12/10/15 Zatkovitch Decl., ¶ 129.

148.     Until the inventions recited in the Rosenberg Patents, the industry had not been able to obtain an acceptable solution to this technological problem.  See, e.g., Davis, Col. 3, Lines 42-45 ("the traditional paradigms of advertising and search engine algorithms fail to effectively deliver relevant information via the World Wide Web to interested parties in a cost-effective manner.").  12/10/15 Zatkovitch Decl., ¶ 130.

149.     To solve these problems, Mr. Rosenberg discloses in the '195 and '059 Patents new, unique, and inventive systems for the presentation of advertisements on the Internet.  12/10/15 Zatkovitch Decl., ¶ 131.

150.     Rosenberg's inventions solved these Internet-based problems with a system for the presentation of advertisements that included a novel set of instructions that, based on an increase in the quantity of viewer action (e.g. clicks) in response to an ad, automatically awarded bonus impressions of an ad without charging beyond the agreed sale price, decreased the cost per impression of the advertising message below a predetermined cost, or lowered the cost of the advertising campaign below a predetermined cost. Rosenberg's inventions result in more relevant and compelling ads automatically getting presented more often to a viewer of the Internet and costing less.  Given how much relative real estate is allocated to advertising content on a web site, Rosenberg's system transformed web sites to be more physically appealing to viewers while giving Buyers a novel incentive to provide and deliver more "relevant and

compelling" advertising messages to consumers *See, e.g.*, '195 Patent, Col. 10, Lines 48-53; Col. 3, Lines 20-25.  12/10/15 Zatkovitch Decl., ¶ 132.

151.     The inventions recited in the claims of the Rosenberg Patents are inventive and improve an existing technological process.  12/10/15 Zatkovitch Decl., ¶ 133.

152.     The inventions recited in the claims of the Rosenberg Patents improve the functioning of the Internet itself where the advertisements presented on web pages to viewers will be more relevant and/or more compelling to viewers.  12/10/15 Zatkovitch Decl., ¶ 134.

153.     The claims of the Rosenberg Patents recite a particular new and useful system for the presentation of Internet advertisements utilizing Mr. Rosenberg's ideas to effect a useful result, an improved Internet.  12/10/15 Zatkovitch Decl., ¶ 135.

154.     The inventions recited in the claims of the Rosenberg Patents provide a technological solution to solve a problem, that does not foreclose other ways of solving the problem, by reciting a specific series of steps that result in a departure from the routine and conventional sequence of events in prior art methods that result in clicking on a hyperlink for an Internet advertisement as disclosed in prior art methods.  If the computer network operated in its normal, expected manner, the Internet viewer would be bombarded with irrelevant ads and the Buyer would be charged the agreed upon cost for ads.  Instead, using Mr. Rosenberg's invention, a Buyer is awarded bonus impressions of an advertising message (decreasing the effective predetermined cost for an advertising campaign), the cost per impression of the advertising message is decreased, or the cost of an advertising campaign to the Buyer is lowered below a predetermined cost, based on the number of viewer actions (*e.g.*, clickthroughs).  This results in better performing ads, *i.e.*, more relevant and appealing ads, getting shown more to Internet users.  While prior methods were logical approaches to advertising based on traditional methods

for the presentation of advertisements, Mr. Rosenberg departed from these prior art methods to solve the Internet user's problem of being bombarded with irrelevant and unappealing ads and the Seller's problem of maintaining high quality and revenue producing ad space on its websites, while confronting the Internet based reality of overabundant supply and the Buyers ability to track ad performance.  12/10/15 Zatkovitch Decl., ¶ 136.

155.    The inventions recited in the claims of the Rosenberg Patents do not merely create or alter contractual relations using a generic computer and conventional network operations, since the bonus exposure of the advertisement physically alters the website to improve the quality of the site to the Viewer and also maximizes the revenue potential for the Seller.  12/10/15 Zatkovitch Decl., ¶ 137.

156.    Rosenberg's system could not exist outside a digital environment like the Internet because offline media advertisers could not track the response of every single ad impression served to every single individual and then, dynamically adjust the pricing instructions to change the presentation of these advertisements in real time. Rosenberg's solution could not exist outside a digital environment like the Internet, because the Internet is the only media that has such an imbalance of supply over demand that the inventory is available to provide bonus exposure in this manner.  Rosenberg's system could also only be performed by a computer because it is impossible for a human being to place an advertisement on a web page.  12/10/15 Zatkovitch Decl., ¶ 138.

157.    Thus, the claims of the Rosenberg Patents recite solutions that are necessarily rooted in computer technology to overcome problems specifically arising in and unique to the Internet.  The inventions recited in the claims of the Rosenberg Patents improve the

functioning of the Internet itself by the presentation of advertising messages presented to viewers that will be more relevant and compelling.  12/10/15 Zatkovitch Decl., ¶ 139.

158.     The claims of the Rosenberg Patents do not merely recite an effect or result without any restriction on how the result is accomplished.  For example, the claims of the Rosenberg Patents do not merely recite the result of improved advertising content (presentation of more relevant and compelling advertisements) by any method however developed.  12/10/15 Zatkovitch Decl., ¶ 140.

159.     The claims of the Rosenberg Patents specify how the ad serving technology is manipulated to yield a desired result (e.g., presentation of more relevant and compelling advertisements) – a result that overrides the routine and conventional sequence of events ordinarily triggered by the view of, and click on, an advertisement.  The claims of the Rosenberg Patents recite a particular system for bringing about the desired result of improved advertising content, a result that improves the functioning of the Internet itself, but does not claim every system of accomplishing that result.  12/10/15 Zatkovitch Decl., ¶ 141.

160.     One example of another way of attempting to solve some of the problems addressed by Mr. Rosenberg is disclosed in Davis so the inventions of the Rosenberg Patents do not foreclose other methods for providing Internet advertising, nor does it preclude other methods of rewarding successful advertising.  12/10/15 Zatkovitch Decl., ¶ 142.

161.     The novel aspect(s) of the claims of the Rosenberg Patents is not merely claiming improved speed or efficiency through the use of a computer.  12/10/15 Zatkovitch Decl., ¶ 143.

162.     The computer elements recited in the claims of the Rosenberg Patents are not merely an obvious mechanism for permitting a solution to be achieved more quickly (*e.g.*, using a computer for performing calculations).  12/10/15 Zatkovitch Decl., ¶ 144.

163.     Therefore, the claims of the Rosenberg Patents recite an inventive concept, significantly more than an abstract idea, and are patent-eligible.  12/10/15 Zatkovitch Decl., ¶ 145.

### COUNT I (INFRINGEMENT OF U.S. PATENT NO. 7,089,195)

164.     Plaintiff incorporates paragraphs 1 through 163 herein by reference.

165.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

166.     Plaintiff is the owner of the '195 Patent, entitled "System and Method for the Presentation of Advertisements," with ownership of all substantial rights in the '195 Patent, including the right to exclude others and to enforce, sue and recover damages for past and future infringement.  A true and correct copy of the '195 Patent is attached as Exhibit 2.

167.     The '195 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

168.     Google has and continues to directly infringe one or more claims of the '195 Patent in this judicial district and/or elsewhere in the United States, including at least claim 11, without consent or authorization of Plaintiff, by performing all of the method steps recited in the claim(s) and/or by or through importing, making, using, offering to sell, and/or selling internet advertising products, services, and/or systems, including but not limited to AdWords and/or Adsense, that infringe one or more claims of the '195 Patent, including at least claim 11.

169.     Plaintiff has been damaged as a result of Google's infringing conduct as described herein.  Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Google's infringement, which by law, cannot be less than a reasonable royalty, together with interest and costs fixed by this Court pursuant to 35 U.S.C. § 284.

170.     Google's actions complained of herein will continue unless Google is enjoined by this Court.

## COUNT II (INFRINGEMENT OF U.S. PATENT NO. 8,799,059)

171.     Plaintiff incorporates paragraphs 1 through 170 herein by reference.

172.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

173.     Plaintiff is the owner of the '059 Patent, entitled "System and Method for the Presentation of Advertisements," with ownership of all substantial rights in the '059 Patent, including the right to exclude others and to enforce, sue and recover damages for past and future infringement.  A true and correct copy of the '059 Patent is attached as Exhibit 3.

174.     The '059 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code.

175.     Google has and continues to directly infringe one or more claims of the '059 Patent in this judicial district and/or elsewhere in the United States, including at least claim 6, without consent or authorization of Plaintiff, by or through importing, making, using, offering to sell, and/or selling internet advertising products, services, and/or systems, including but not limited to AdWords and/or Adsense, that infringe one or more claims of the '059 Patent, including at least claim 6.

176.     Plaintiff has been damaged as a result of Google's infringing conduct as described herein.  Google is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Google's infringement, which by law, cannot be less than a reasonable royalty, together with interest and costs fixed by this Court pursuant to 35 U.S.C. § 284.

177.     Google's actions complained of herein will continue unless Google is enjoined by this Court.

## WILLFUL INFRINGEMENT

178.     Plaintiff incorporates paragraphs 1 through 177 herein by reference.

179.     At least as early as August, 2000, Ari Rosenberg conceived of the inventions recited in the claims of the Asserted Patents.

180.     At that time, Ari Rosenberg was working for a company called Snowball.com, an online advertising company.

181.     In August 2000, Ari Rosenberg explained his ideas to certain Snowball.com employees, who shortly thereafter left to go work for Google.  In August, 2000, Mr. Rosenberg called Tim Armstrong on his cell phone and explained his idea.  On this call, Mr. Armstrong voiced excitement for the idea.  Around that time, Mr. Rosenberg also explained his ideas and gave written materials discussing his ideas to David Hirsch and Christina Elwell.  Tim Armstrong, David Hirsch, and Christina Elwell all went to work for Google.

182.     On information and belief, Google copied Ari Rosenberg's inventions that are recited in the claims of the Asserted Patents.  Additional allegations regarding Google's copying of Ari Rosenberg's inventions, knowledge that Ari Rosenberg had filed an application for the '195 Patent, and willfully and deliberately infringing the Asserted Patents will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

183.     Google is the assignee of U.S. Patent No. 8,700,470, attached as Exhibit 7.

184.     During prosecution of U.S. Patent No. 8,700,470, in an office action dated June 24, 2013, the examiner cited U.S. Application Publication No. 2002/0184088 as prior art to Google's claims.

185.     U.S. Application Publication No. 2002/0184088 is the publication number for the application that issued as Ari Rosenberg's '195 Patent.

186.     Thus, at least as early as on or around June 24, 2013, Google knew of Ari Rosenberg's application for the '195 Patent.

187.     On information and belief, Google has known of the '195 Patent since at least as early as on or around June, 24 2013, and continued to infringe the '195 Patent since at least as early as that time and continued to infringe the '059 Patent since it issued on August 5, 2014.  On information and belief, this infringement has been despite an objectively high likelihood that its actions constitute infringement of the Asserted Patents and a subjective knowledge or obviousness of such risk.  Additional allegations regarding Google's knowledge of the Asserted Patents and willful infringement will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## ADDITIONAL ALLEGATIONS

188.     Plaintiff has been damaged as a result of Google's infringing conduct described herein.  Google is liable to Plaintiff in an amount that adequately compensates Plaintiff for Google's infringing conduct, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by the Court under 35 U.S.C. § 284.

189.     Google's actions complained of herein will continue unless Google is enjoined by this Court.

190.     This case is exceptional pursuant to the provisions of 35 U.S.C. § 285.

191.     Plaintiff has complied with 35 U.S.C. § 287.

192.     Google's actions complained of herein are causing irreparable harm and monetary damage to Plaintiff and will continue to do so unless and until Google is enjoined and restrained by this Court.

## JURY DEMAND

193.     Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

194.     Plaintiff requests that this Court find in its favor and against Google, and that this Court grant Plaintiff the following relief:

A.  Enter judgment for Plaintiff on this Complaint;

B.  Enter judgment that one or more claims of the '195 Patent has been infringed by Google;

C.  Enter judgment that one or more claims of the '059 Patent has been infringed by Google;

D.  Enter judgment that Google's infringement has been willful;

E.  Enter judgment that Google account for and pay to Plaintiff all damages to, and costs incurred by, Plaintiff because of Google's infringing activities and other conduct complained herein;

F.  Aware Plaintiff damages resulting from Google's infringement in accordance with 35 U.S.C. § 284;

G.  Enter a permanent injunction enjoining Google and its officer, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with them, from infringing the '195 and '059 Patents or, in the alternative, judgment that Google account for and pay to Plaintiff a reasonable royalty and an ongoing post judgment royalty because of Google's past, present, and future infringing activities and other conduct complained of herein;

H.  Grant Plaintiff pre-judgment and post-judgment interest on the damages caused by Google's infringing activities and other conduct complained of herein;

I.  Treble the damages in accordance with the provisions of 35 U.S.C. § 284;

J.  Find the case to be exceptional under the provisions of 35 U.S.C. § 285; and

K.  Grant Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

Dated:  December 11, 2015                    Respectfully submitted,

/s/   Anthony G. Simon
Anthony G. Simon (*pro hac vice* pending)
Timothy D. Krieger (*pro hac vice* pending)
Benjamin R. Askew (*pro hac vice* pending)
Michael P. Kella (*pro hac vice* pending)
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
Saint Louis, Missouri  63101
Phone:  (314) 241-2929
Fax:  (314) 241-2029
asimon@simonlawpc.com
tkrieger@simonlawpc.com
baskew@simonlawpc.com
mkella@simonlawpc.com

*COUNSEL FOR PLAINTIFF*
*PERFORMANCE PRICING HOLDINGS, LLC*